**SO ORDERED.**

**SIGNED October 01, 2009.**



_____
**ROBERT SUMMERHAYS**
**UNITED STATES BANKRUPTCY JUDGE**

---

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA

IN RE:

EDDIE AUSTIN                              CASE NO. 07-20702

    Debtor                               Chapter 7
-------------------------------------------------------------
JOSSEE MARIE BETER, ET AL

    Plaintiffs

VERSUS                                   ADV. PROCEEDING NO. 08-2001

EDDIE AUSTIN

    Defendant                **09JD-2002**

-------------------------------------------------------------
REASONS FOR DECISION
-------------------------------------------------------------

The above-styled adversary proceeding was commenced by
plaintiffs Lillian O. Beter, Josee-Marie Beter, and The Beter
Family Trust ("Plaintiffs") against the debtor, Eddie Douglas
Austin, Jr. ("Austin"). Plaintiffs seek a determination that

Austin's debt to them is non-dischargeable under 11 U.S.C §§523(a)(2)(A), (a)(4), and (a)(6). This matter was tried to the court during which the parties presented witness testimony and trial exhibits supporting their positions. Following the trial, the parties submitted post-trial briefs and proposed findings of fact and conclusions of law. Following the filing of these post-trial briefs, the court took the case under submission. In addition to Plaintiffs' claims, Rudy O. Young, the duly-appointed Chapter 7 Trustee (the "Trustee") filed a motion to sell a valuable men's diamond ring in the possession of the debtor. Because Plaintiffs claim ownership of this ring based on the evidence and arguments at issue in this adversary proceeding, the court consolidated the Trustee's motion to sell with the present adversary proceeding. Accordingly, the court took the Trustee's motion under submission along with the present adversary proceeding.

### JURISDICTION

The court has jurisdiction over the matters asserted in this adversary proceeding as well as the Trustee's motion to sell pursuant to 28 U.S.C. §§1334 and 157(a). This matter is a core proceeding in which this court may enter a final order pursuant to 28 U.S.C. §157(b)(2)(I) and (J). The following Reasons for Decision shall constitute the court's findings of fact and conclusions of law.

-2-

**FACTS**

**A.    The Parties.**

Lillian O. Beter ("Lilly Beter" or "Beter"), was the president of Lilly Beter Capital Group ("LBCG"). Beter formed LBCG with her business partner, William Rubin, a/k/a John Maxmin. LBCG provided business consulting as well as assistance in raising financing for small businesses and start-up enterprises. Lilly Beter and Rubin had a business as well as a personal relationship. Beter has three children and currently resides in Minnesota.

Plaintiff, Josee-Marie Beter ("J.M. Beter"), is Lilly Beter's daughter and is the trustee of the third plaintiff, the Beter Family Trust (the "Trust"). J.M. Beter also resides in Minnesota. The Trust is a Minnesota trust. J.M. Beter and Lilly Beter's other two children are beneficiaries of the Trust.

Austin is a Louisiana attorney who formerly maintained a law practice in Lake Charles, Louisiana under the name "The Austin Law Firm." Austin commenced a case under Chapter 11 of the Bankruptcy Code on October 4, 2007. On November 6, 2007, the case was converted to a case under Chapter 7 of the Bankruptcy Code.

**B.    Lilly Beter Retains Austin in December 2004.**

Lilly Beter retained Austin as her attorney on December 15, 2004, to represent her in connection with disputes arising out of the operation of LBCG. The background to Beter's retention of

-3-

Austin in 2004 is largely undisputed. Lilly Beter's legal troubles began in or around November 2004 when Bill Rubin died. Several of LBCG's clients claim that Rubin had mislead them about their projects and had failed to follow through on projects. Other clients alleged that they had invested money with Rubin, and demanded that LBCG and Beter return their money. Lilly Beter met Austin when she attended a meeting of disgruntled clients in December 2004 at the Florida offices of LBCG. Present at the meeting were clients, including Jerry Golden and his partners (the "Golden Group"), Justin Gasarch ("Gasarch"), Maurice Stone (a representative of an entity called Cornerstone) ("Stone"), Austin, and Dr. Richard Bono ("Bono"). At the time, Bono was a friend of both Lilly Beter and Austin, as well as President and majority shareholder of SATX, Inc. and Total Telephone Concepts. Total Telephone was a client of LBCG. At the time, Austin served as legal counsel for Cornerstone. The testimony at trial revealed that the December 2004 meeting was contentious and that Lilly Beter feared that the Golden Group and other clients would commence legal actions against LBCG and Beter personally. (Tr. Vol. 4, p. 172-173.) Lilly Beter also feared that Golden and other creditors would attempt to seize her assets. During this meeting, Beter consulted with Bono, who recommended that she retain Austin to serve as her lawyer. Lilly Beter then met with Austin and retained

-4-

him as her lawyer.[1]  In or around June 2005, Austin hired William

Skolnick ("Skolnick") to act as local counsel in Minnesota to

assist in the defense of a case brought by the Golden Group.  (Tr.

---

[1] During trial, Plaintiffs proffered documents relating to a
Louisiana attorney disciplinary complaint filed against Austin by
another client prior to his retention by Plaintiffs (the "Hutto
Complaint").  These documents were marked as proposed exhibit P-
19.  Austin objected to the admission of these documents under
Federal Rules of Evidence 401 (relevancy), 403 (probative value
substantially outweighed by the danger of unfair prejudice), and
404 (improper use of evidence of "prior bad acts").  The contents
of the disciplinary complaint center on allegations that Austin
failed to account for or return client funds, and Plaintiffs
contend that this evidence is relevant to show that Austin knew
about his obligations under the Louisiana Rules of Professional
Conduct as far as the treatment of client property.  Plaintiffs
also contend that Austin did not disclose the Hutto Complaint to
Beter in December 2004 when he was retained.  However, the record
also reveals that the Hutto Complaint was ultimately dismissed.
Considering the record as a whole, the court sustains Austin's
objection.    The Hutton Complaint did not involve any of the
parties or transactions at issue in the present case.  Moreover,
a core issue in that proceeding was whether Austin had an
attorney-client relationship with Hutto.  There is no dispute in
the present case that Austin had an attorney-client relationship
with Plaintiffs in the present case.    While this evidence may be
relevant to show "knowledge" or "absence of mistake" on Austin's
part, Austin also testified that he was aware of his obligations
under the rules of professional conduct and admitted that he had
violated these rules in his representation of Plaintiffs.
Accordingly, the documents pertaining to the Hutto matter are
cumulative and, in light of the different facts at issue in the
Hutto proceeding and the ultimate dismissal of that complaint,
the probative value of the documents is substantially outweighed
by the danger of unfair prejudice and confusion of the issues.
Moreover, the evidence is improper evidence of "prior bad acts"
which, under Rule 404(b), is not admissible "to prove the
character of a person in order to show action in conformity
therewith."    Plaintiffs' request to admit exhibit P-19 is
denied.

Vol. 1, pp. 29-30.) The Golden Group had obtained a default judgment against Beter in Florida, and were attempting to domesticate the judgment in Minnesota. (Id.) Skolnick ultimately assumed a broader role as Austin's co-counsel in Beter's various matters.

## C. **The Terms of Austin's Retention**.

The relationship between Austin and Plaintiffs was not a conventional attorney-client relationship. The complexity of this case reflects this unconventional relationship and the fact that the terms of Austin's retention are largely undocumented. The only documents outlining the terms of Austin's retention portray a conventional attorney-client relationship: a December 14, 2004 letter proposing to provide civil and criminal representation to Lilly Beter, and a December 15, 2004 engagement letter (the "December 2004 Engagement Letter"). (Pl. Exh. 6, 7.) The Engagement Letter provided that Austin was to bill his time at an hourly rate of $250.00, and that his time was to be billed in tenth of an hour increments. This agreement further provided that Austin was to provide Lilly Beter with monthly invoices for fees and costs and that "no charges or expenses shall be incurred...without the prior knowledge and approval of the Client." With respect to bills, the agreement provided that Beter "would receive detailed monthly statements of all fees and costs," and that Austin was to

-6-

receive "payment within 10 days of billing for all outstanding fees and costs once or if the initial retainer has been exhausted." (Pl. Exh. 6,7.)

While Austin and plaintiffs dispute the specific terms and scope of Austin's representation, it is clear from the record that the December 2004 Engagement Letter does not reflect the actual relationship that evolved between Austin and Plaintiffs after December 2004. Austin testified that he proposed a 6-part "plan" to Lilly Beter during a meeting in Minnesota in late December 2004. Austin's plan included changes to Beter's lifestyle to reduce costs, efforts to settle potential claims by the former clients of LBCG, efforts to insulate Beter from potential civil and criminal liability, and a strategy to paint Lilly Beter as another "victim" of Bill Rubin. (Tr. Vol. 5, pp. 279-287.) The linchpin of Austin's proposed plan was that Beter was to wire all of her funds – including the assets of the Trust – to Austin, who would treat these funds as a "potential" fee and thus avoid any attempts by the Golden Group or Beter's other creditors to seize these funds. (Tr. Vol. 5, pp. 296-297.) Austin's plan also provided that Austin would work with Lilly and J.M. Beter to collect and liquidate additional property, including cars, real estate, and jewelry. Austin would then use the proceeds from the sale of these assets and the cash wired to him to settle with LBCG's former clients.

-7-

Austin's goal was to settle pending litigation and prevent the filing of any additional civil or criminal proceedings. In addition, Austin would wire funds back to the Beters for living expenses. The record also reflects that Austin paid some of Plaintiffs' credit card bills and other living expenses. (Tr. Vol. 3, p. 239.) Finally, Austin testified that he and Lilly Beter agreed not to document their transactions, and that the "plan" would be kept secret from J.M. Beter and Skolnick.

Lilly Beter testified at trial that she never agreed that Austin would treat the cash wired to him as a "potential" fee, or that she agreed to keep their agreement and transactions confidential. Beter, however, never denied the basic elements of Austin's "plan": that the Beters were to transfer their cash to Austin, liquidate much of their property with Austin's assistance, and receive cash wires back from Austin for living expenses. These basic facts are established by the record. Moreover, although Lilly Beter denies that her intent was conceal assets from the legitimate claims of creditors, she testified that her actions were motivated by a fear that Golden and other creditors would seize her assets. (Tr. Vol. 4, p. 267.) Finally, while Lilly Beter and Austin are the parties to the December 2004 Engagement Letter, Austin and the Beters testified that Austin served as the attorney for J.M. Beter and the Trust as well as Lilly Beter.

-8-

D. **Plaintiffs Transfer Property to Austin**.

1. **Wire Transfers and Cash.**

On December 14, 2004, Lilly Beter paid Austin a $15,000 cash retainer. From December 2004 through May 2005, the Trust wired a total of $1,585,000 to Austin's law firm trust account. These wires included an additional $15,000 retainer for Austin. Austin also received funds on Plaintiffs' behalf from a settlement with Joseph Passalaqua and from the sale of a Florida condominium owned by Lilly Beter.[2] Austin also received $144,700 cash that had been kept in a safety deposit box. In total, Austin received the following wires and cash from Plaintiffs:[3]

| Date | Amount | Description |
|---|---|---|
| 12/17/04 | 15,000.00 | Retainer fee (L. Beter) |
| 12/23/04 | 15,000.00 | Retainer fee (Trust) |
| 12/23/04 | 1,300.000.00 | Beter Family Trust wire |
| 06/03/05 | 270,000.00 | Beter Family Trust wire |
| 12/30/05 | 115,000.00 | Passalaqua settlement |
| 05/03/06 | 5,602.50 | Closing proceeds |
| 05/05/06 | 12,500.00 | Closing funds |
| 11/06 | 144,700.00 | Cash in satchel |
| **TOTAL** | **$1,877,802.50** | |

2. **Jewelry and Gold Coins.**

Lilly and J.M. Beter also transferred three batches of jewelry and watches to Austin from December 2004 through November 5, 2005.

---

[2] Passalaqua had seized and sold a number of vehicles owned by the Beters, but failed to pay any of the proceeds to the Beters. The Beters ultimately settled with Passalaqua.

[3] (Pl. Exh. 23; Tr. Vol. 2, p. 49.)

The first batch of jewelry consisted of seven to eight watches that Austin ultimately sold for $70,000. (Tr. Vol. 4, pp. 57-58.) Plaintiffs do not dispute that Austin was authorized to sell this first batch of jewelry. (Id.) Austin testified that he received $120,000 for the second batch of jewelry and $150,000 for the third batch of jewelry by selling the pieces individually. (Tr. Vol. 6, pp. 72-73.) The third batch of jewelry he received also included 236 gold Krugerrand coins. Austin testified that he sold the Krugerrands for $122,000. (Tr. Vol. 2, p. 109.) Austin testified that he did not keep any written records of these sales or the cash that he received from each sale. (Tr. Vol. 2, p. 104). Austin testified that he kept records of the jewelry he received along with information on the value of the jewelry, but that he ultimately destroyed these records based on his agreement with Lilly Beter. (Id.) Austin further testified that, at times, he kept the jewelry in a satchel at the business of a jeweler by the name of Diamond Durrell. Austin further testified that he and Bono purchased some of the jewelry, including the men's diamond ring in the possession of the Trustee. (Id.) According to Austin, Lilly Beter agreed to sell the ring to him. Austin testified that he agreed to pay $40,000.00 for the ring, which was the highest estimated value of the ring. (Tr. Vol. 6, p. 125).

Lilly Beter testified that, while Austin was authorized to seek buyers for the second and third batches of jewelry, he did not

-10-

have the authority to actually sell specific items of jewelry without her consent. Beter testified that she did not consent to the sale of the jewelry from the second and third batches, nor did she instruct Austin to destroy his records pertaining to the value of the jewelry. She further testified that Austin never informed her that the jewelry had been sold. Beter also testified that she did not consent to Austin purchasing the ring held by the Trustee. In or around May 2006, Skolnick requested the return of certain items from these two batches of jewelry in order to settle a lawsuit filed by J.B. Hudson, the jeweler who originally sold much of the jewelry to the Beters. (Pl. Exh. 69, 75.) Skolnick testified that Austin returned some items of jewelry, but did not return the items requested to settle the J.B. Hudson lawsuit. Austin did not disclose to Skolnick that he had sold the jewelry.

At trial, Plaintiffs introduced an inventory of the jewelry and gold coins provided to Austin. (Pl. Exh. 17.) Skolnick testified that he prepared the inventory based on sales records from J.B. Hudson. Based on the retail sale prices from J.B. Hudson's records, Plaintiffs contend that the total value of the jewelry and gold coins transferred to Austin was $1,759,370. Of this amount, Plaintiffs contend that $1,590,370 is unaccounted for after subtracting the value of jewelry returned and the diamond ring in the possession of the Trustee.[4]

---

[4] At trial, Plaintiffs proffered a purported inventory of jewelry contained in the third batch of jewelry delivered to

-11-

**E.** **Disbursements of Plaintiffs' Funds.**

The record reflects that Austin made the following disbursements of Plaintiffs's funds and cash:

| | |
|---|---:|
| Skolnick's legal fees | $ 265,436.56 |
| Shapiro's legal fees | 5,000.00 |
| Payments to/for Plaintiffs | 405,451.50 |
| Payments to Petra Beter | 118,156.96 |
| Andrew Farmer payment | 24,426.68 |
| Gasarch Settlement | 150,000.00 |
| Renato & Olivera payment | 50,000.00 |
| Austin payment to Beters | |
| in State Court Case | 100,000.00 |
| Maurice Stone/Cornerstone | 257,500.00 |
| Richard Bono | 216,147.86 |
| Austin's Fees and Expenses | 300,000.00 |
| Loan to Grace Doyle (Austin's client) | 160,000.00 |

(See Pl. Exh. 3 and 23.) These disbursements total $2,052,119.56. Lilly Beter and J.M. Beter testified that Austin was never authorized to make the payments to Bono, Stone, and Doyle, and that Austin never regularly billed them for his attorneys' fees and expenses as required by the December 2004 Engagement Letter. They further testified that Austin was not authorized to withhold their

---

Austin - exhibit P-16. Austin objected to the exhibit on the grounds that Plaintiffs had not established the authenticity of the document. The court took the objection under advisement. Based on the court's review of the record, this exhibit appears to be duplicative of other testimony and documents already admitted. The court sustains Austin's objection to P-16.

funds for the payment of his fees and expenses. Out of the total disbursements made by Austin, Plaintiffs contend that only $1,118,471.70 of the disbursements were authorized, leaving $759,330.80 of the funds and cash transferred to Austin (excluding the jewelry and gold coins) either unaccounted for, or disbursed without authority.

Austin testified that Lilly Beter authorized the disbursements to Stone and Bono. Austin testified that $175,000 of the payment to Stone was for the purchase of a corporate shell for Stone's new business – Intrepid. At trial, Stone testified that his former company, Cornerstone, lost money and ultimately failed because of misrepresentations made by Rubin and LBCG. (Tr. Vol. 5, pp. 119-121.) Austin testified that the payments were made to prevent Stone and/or Cornerstone from filing suit against Beter. Austin also testified that he was the former attorney for and a shareholder of Cornerstone. Stone testified that Cornerstone's Board of Directors allowed Austin to represent Plaintiffs because they thought Austin would be able to get some "consideration" from Plaintiffs by doing so. (Tr. Vol. 5, p. 151.) Austin also testified that he was a shareholder of Intrepid and served as Intrepid's lawyer. Lilly and J.M. Beter testified that they had never received a demand letter from Stone, and that they never authorized Austin to pay him. Stone testified that he never sent

-13-

a demand letter to Beter. (Tr. Vol. 5, p. 154.) Stone did not execute a settlement agreement or release in return for the money given to him.

With respect to the payments to Bono, Austin and Bono testified that the payments were reimbursements for expenses Bono incurred on behalf of Plaintiffs for travel and related expenses incurred in representing Plaintiffs. The payments also reflected losses that Bono's company - Total Telephone - allegedly sustained as a result of the actions of Rubin and LBCG. (Tr. Vol. 4, pp. 315-321, 331-333.) Austin was an investor and part owner in Total Telephone at the time Bono received payments from Austin. (Tr. Vol. 5 pp. 8, 21.) Both Lilly and J.M. Beter testified that Austin was not authorized to make these payments to Bono. Like Stone, Bono did not execute a settlement agreement or release.

Finally, Austin testified that he returned approximately $400,000 in cash to Lilly and J.M. Beter for bills and living expenses over and above the wires acknowledged by Plaintiffs. According to Austin, he would deliver the cash in $10,000 increments during his trips to visit the Beters in Minnesota. (Tr. Vol. 6, pp. 89-90.) Bono testified that he also brought cash to the Beter's on several occasions. (Tr. Vol. 4, pp. 343-344.) Both Lilly and J.M. Beter testified that the only cash that they received from Austin was $10,000 on one visit. The remaining disbursements were through wires.

-14-

**F.    The Gasarch Settlement.**

Justin Gasarch was a former client of LBCG who had threatened litigation against Lilly Beter based on losses allegedly suffered as a result of Rubin's actions.  Austin negotiated a Memorandum of Understanding ("MOU") with Gasarch to settle his claims against Beter.    The MOU provided for payments totaling $400,000: two payments of $50,000 and one payment of $300,000.  (Def. Exh. 260, 261.)   The MOU also required Lilly Beter to deliver to Gasarch 2,000,000 shares of stock in Peninsula Holdings Group, a company in which Beter had an ownership interest. (_Id._) Austin testified that he made a payment of $150,000 to Gasarch pursuant to the MOU, but that Lilly Beter instructed him not to make any additional payments to Gasarch.  Austin also testified that Lilly Beter did not comply with the other terms of the MOU, including the transfer of her shares of Peninsula stock.

**G.    Plaintiffs Request an Accounting.**

Lilly and J.M. Beter testified that by the end of 2005 they had made numerous requests to Austin for an accounting of their property and the status of payments to creditors.   The Beters ultimately traveled to Florida to meet with Austin on the status of their money and property in January 2006.   (Tr. Vol. 3, p. 7.) During that meeting, Austin provided Plaintiffs with a handwritten accounting of their property and cash.   (Tr. Vol. 3, pp. 8-15; Pl.

-15-

Exh. 21.) The handwritten accounting reflected payments to Gasarch by Austin totaling $300,000.00. Austin, however, testified that the actual amount he paid Gasarch was only $150,000.00. (Tr. Vol. 3, p. 18.) Austin's handwritten accounting also did not disclose the payments to Stone and Bono totaling $473,674.86. (Pl. Exh. 21). Finally, the accounting did not reflect the sale of the second and third batches of jewelry, nor did it reflect the sale of the Krugerrands. Austin testified that Lilly Beter requested that the accounting not include these payments or the sale of the jewelry in order to keep this information from J.M. Beter. (Tr. Vol. 3, p. 222.) Both Lilly Beter and J.M. Beter testified that they believed the accounting to be accurate, and that they never instructed Austin to falsify the accounting. At the conclusion of the meeting, Austin instructed Plaintiffs to destroy the handwritten accounting. (Tr. Vol. 3, p. 222; Vol 1, p. 75.) The Beters did not destroy the accounting, but instead ultimately turned the accounting over to Skolnick.

Both Lilly and J.M. Beter testified that they continued to have problems contacting Austin and obtaining information about their property after this January 2006 meeting. The record shows that after January 2006, Plaintiffs attempted to communicate with Austin directly or through Skolnick. The record includes e-mails and letters from Skolnick to Austin in May and June 2006 requesting

-16-

the return of Plaintiffs' property. (Pl. Exh. 66, 68, 69, 70, 71, 72, 73, 76.)

## H.    The Minnesota Lawsuit.

In August 2006, Plaintiffs commenced litigation against Austin in Minnesota District Court, Hennepin County, in a case captioned *Lillian o. beter, josee-Marie E. Beter and Beter Family Trust v. Eddie D. Austin, Jr., d/b/a The Austin Law Firm and Kathleen M. Delaney*, File No. 27 CV 06-15013 (the "Minnesota Action") (Pl. Exh. 1.)  The state court entered an order requiring Austin to produce an accounting of the property received from the Beters. (Pl. Exh. 2.)   The parties also filed summary judgment motions, which resulted in the state court's Findings of Fact, Conclusions of Law, and Order dated September 12, 2007 ("Minnesota Findings").[5]   The

---

[5]The specific Minnesota Findings are as follows:

a)    Austin had an attorney-client relationship with Plaintiffs;
b)    Following the creation of this attorney-client relationship, Austin received at least $2,300,000 in cash and assets from the Plaintiffs;
c)    As of November 17, 2006, Austin no longer possessed any of the cash or personal property he received from the Plaintiffs;
d)    Austin can only account for how he disposed of $1,522,641.60 of the more than $2,300,000 that he admits he received from the Plaintiffs;
e)    Austin paid $473,647.86 of Plaintiff's monies entrusted to him to his close friends and business colleagues, Maurice Stone and R. J. Bono and their companies;
f)    Austin has no documentary record of how he spent the remainder of the monies that the Plaintiffs transferred to him;

-17-

Minnesota Action was stayed when Austin commenced the present bankruptcy case.

## DISCUSSION

### A. The Burden of Proof in an Action to Determine the Dischargeability of a Debt.

The creditor has the burden of proof in an action to determine the dischargeability of a debt. Grogan v. Garner, 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). "Intertwined with this burden is the basic principle of bankruptcy that exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start." Hudson v. Raggio & Raggio, Inc. (In re Hudson), 107 F.3d 355, 356 (5th Cir. 1997). Accordingly, a creditor must establish each an every element of a statutory exception to discharge under 11 U.S.C. § 523 et seq. by a preponderance of the evidence. Plaintiffs seek a determination that Austin's debts to them are non-dischargeable on the following grounds:

> (1) Defalcation or fraud by a fiduciary under 11 U.S.C.
> § 523(a)(4);

---

g)  Austin admits that he took approximately $450,000 of Plaintiffs' monies to pay himself for attorneys' fees and costs; and
h)  Austin did not maintain time records to substantiate work he and his law firm performed for Plaintiffs, nor did he ever create billing statements for the Plaintiffs.

-18-

(2)    embezzlement under section 523(a)(4);

(3)    false    pretenses    or    fraud    under    section
       523(a)(2)(A); and

(4)    willful and malicious conduct under 11 U.S.C. §
       523(a)(6).

**B.    Non-Dischargeability Under 11 U.S.C § 523(a)(4) --
       Fraud or Defalcation by a Fiduciary, Larceny, and Embezzlement**

   **1.    Elements of a Claim Under § 523(a)(4).**

The Bankruptcy Code excepts from discharge any debt "for fraud
or defalcation while acting in a fiduciary capacity, embezzlement
or larceny." 11 U.S.C. § 523(a)(4). This exception "was intended to
reach those debts incurred through abuses of fiduciary positions
and through active misconduct whereby a debtor has deprived others
of their property by criminal acts; both classes of conduct involve
debts arising from the debtor's acquisition or use of property that
is not the debtor's." Miller v. J.D. Abrams Inc. (In re Miller),
156 F.3d 598, 602 (5th Cir. 1998) (quoting In re Boyle, 819 F.2d
583, 588 (5th Cir. 1987)). With respect to embezzlement and
larceny,  the manner in which the debtor comes into possession of
the property determines which definition applies. For purposes of
section 523(a)(4), embezzlement is defined as the "fraudulent
appropriation of property by a person to whom such property has
been entrusted, or into whose hands it has lawfully come." In re
Miller, 156 F.3d at 602 (emphasis added).  Larceny is defined as

-19-

the "fraudulent and wrongful taking and carrying away of the property of another with intent to convert it to the taker's use and with intent to permanently deprive the owner of such property." In re Hayden, 248 B.R. 519, 526 (N.D. Tex. 2000) (emphasis added).

## 2. Was There a Fiduciary Relationship Within the Meaning of § 523(a)(4)?

In order to establish a non-dischargeability claim for fiduciary fraud or defalcation, Plaintiffs must establish that their relationship with Austin fell within the narrow confines of section 523(a)(4). Not all fiduciary relationships under state law fall within section 523(a)(4). The type of relationship required to trigger liability for fraud or defalcation under section 523(a)(4) is determined by federal law. A fiduciary under section 523(a)(4) is narrowly defined, applying only to technical or express trusts. In re Bennett, 989 F.2d 779, 784 (5th Cir. 1993)( citing In re Angelle, 610 F.2d 1335 (5th Cir.1980)); see also In re Tran, 151 F.3d 339, 342 (5th Cir. 1998); In re Schwager, 121 F.3d 177, 186 (5th Cir. 1997). The requisite trust relationship must exist prior to the act creating the debt and without reference to that act. In re Bennett, 989 F.2d at 784; see also In re Tran, 151 F.3d at 342 (trustee's obligations must have been imposed prior to, rather than by virtue of, any claimed misappropriation or wrong). "In other words, the trust giving rise to the fiduciary relationship must be imposed prior to any wrongdoing. The debtor

-20-

must have been a trustee before the wrong and without any reference to it." In re Bennett, 989 F.2d at 784 (citation omitted). Therefore, constructive trusts or trusts *ex malificio* are insufficient to create a fiduciary relationship within the meaning of section 523(a)(4). See In re Tran, 151 F.3d at 342. However, the " 'technical' or 'express' trust requirement is not limited to trusts that arise by virtue of a formal trust agreement, **but includes relationships in which trust-type obligations are imposed pursuant to statute or common law**." In re Bennett, 989 F.2d at 784-85 (emphasis added). While federal law governs the scope of the fiduciary relationships that fall within the ambit of § 523(a)(4), courts look to state law in determining whether the "trust-type obligations" cited in Bennett exist.

Although the December 2004 Engagement Letter was signed by Lilly Beter, Austin testified that he also acted as attorney for J.M. Beter and the Trust. The attorney-client relationship is that of a fiduciary under Louisiana and Minnesota law. See Soderquist v. Kramer, 595 So.2d 825 (La. App. 2d Cir. 1992); Plaquemines Parish Comm'n Council v. Delta Dev. Co., 502 So.2d 1034 (La. 1987); STAR Centers, Inc. v. Faegre & Benson, L.L.P., 644 N.W.2d 72, 78 (Minn. 2002) ("An attorney-client relationship gives rise to fiduciary duties"). However, given the "technical or express trust" limitation on a section 523(a)(4) claim, the law requires "more

than an attorney-client relationship alone to establish a fiduciary relationship for purposes of § 523(a)(4)." _In re Young_, 91 F.3d 1367, 1371 (10th Cir. 1996). The record in the present case reflects that Austin's role was not limited merely to providing legal services. In additional to providing legal advice, Austin performed "trust-like" duties in holding and disbursing Plaintiffs' funds for their benefit, and in collecting and liquidating jewelry and other property owned by Plaintiffs. Louisiana's rules of professional conduct impose strict obligations on lawyers who handle client property, and these obligations mirror the obligations imposed on the trustee of a "technical or express trust." _See_, _e.g._, L.R.P.C. Rule 1.15 (requiring that lawyers maintain client property in separate accounts and imposing obligation to provide an accounting to clients); _In re Pharr_, 950 So.2d 636 (La. 2007) (disciplining lawyer who misused client funds held in trust account and failed to provide an accounting to his client when requested). Accordingly, the record establishes that the relationship between Austin and Plaintiffs was a fiduciary relationship within the meaning of section 523(a)(4).

### 3. Was There a Defalcation by Austin?

A "defalcation" is a willful neglect of duty, and a willful neglect of duty by a person owing a fiduciary duty is evaluated by a "recklessness standard." _See_ Office of Thrift Supervision v. Felt

-22-

(In re Felt), 255 F.3d 220, 226 (5th Cir. 2001). This recklessness standard is "a lesser standard than fraud and ... does not require actual intent, as does fraud." Schwager v. Fallas (In re Schwager), 121 F.3d 177, 185 (5th Cir.1997). "While defalcation may not require an actual intent, it does require some level of mental culpability." Id. This willful neglect standard is "measured objectively by reference to what a reasonable person in the debtor's position knew or reasonably should have known." In re Felt, 255 F.3d at 226. Because this standard is evaluated objectively, it "charges the debtor with knowledge of the law without regard to an analysis of his actual intent or motive." Id. at 226 (citations omitted). In other words, a fiduciary is "presumed to know his legal obligations." Id. at 227.

Plaintiffs contend that Austin's actions amount to defalcation in the following respects:

> (1) Austin withdrew Plaintiffs' funds from his law firm trust account and utilized those funds without Plaintiffs' consent;

> (2) Austin sold Plaintiffs' jewelry and other property without consent;

> (3) Austin failed to account for all of the funds Plaintiffs wired to his trust account, and failed to return funds and property when requested;

> (4) When asked for an accounting, Austin provided Plaintiffs with a false financial statement that did not fully disclose the disposition of Plaintiffs' funds and property;

-23-

(5)  Austin used Plaintiffs' funds to pay gambling debts without consent;

(6)  Austin failed to make payments to settle the claims asserted by Jason Gasarch, which led to further litigation by Gasarch;

(7)  Austin paid Bono and Stone with Plaintiffs' funds without authorization; and

(8)  Austin withheld Plaintiffs' funds for legal fees that were not authorized by any written retainer agreement.

Austin counters that all of his actions were taken with the knowledge and consent of Lilly Beter, and that his actions were consistent with the agreement they reached in December 2004. Determining whether Austin willingly breached his duties - and, accordingly, whether he committed a defalcation - necessarily turns on the parties' agreement and the scope of the authority that Plaintiffs provided to Austin. Austin's actions in the context of a conventional attorney-client relationship would be a clear case of defalcation or worse. However, as explained above, this was not a conventional attorney-client relationship and, unfortunately, the full scope of the relationship was undocumented. Accordingly, Austin's authority and duties must be gleaned from the course of conduct reflected in the record. After considering the record as a whole, the court concludes that Austin's actions amount to defalcation under section 523(a)(4) for the following reasons.

-24-

a.   *Austin cannot contract out of his duties under the Rules of Professional Conduct*

Austin's duties to Plaintiffs are not governed solely by oral and written agreements, but are also controlled by the rules of professional conduct. Austin cannot contract out of his obligations under these rules regardless of his oral agreements with Lilly Beter. The Louisiana Rules of Professional Conduct expressly dictate Austin's duties in handling client funds and property. See, e.g., L.R.P.C. 1.15; In re Pharr, 950 So.2d 636 (La. 2007). The record establishes – and Austin largely concedes – that he did not comply with these rules.

b.   *Austin owed independent duties to J.M. Beter and the Trust*

Even if Austin had an oral agreement with Lilly Beter approving his actions, he had no such agreement with J.M. Beter and the Trust. Indeed, Austin acknowledges that he kept J.M. Beter in the dark. However, as the attorney for J.M. Beter and the Trust, Austin owed them fiduciary duties (and the trust-like duties imposed by the rules of professional conduct) independent of any duties he may have owed to Lilly Beter. Indeed, the Trust's beneficiaries included other members of the Beter family who were not subject to any agreement between Austin and Lilly Beter. Austin cannot rely on his agreements with Lilly Beter to excuse actions that may have harmed the Trust and its beneficiaries.

-25-

   *c.* *Failure to provide an accounting of client property*

  Furthermore, even if Austin and Lilly Beter orally agreed that they would not document their transactions, the record shows that this agreement was no longer valid by the end of 2005 when both Lilly Beter and J.M. Beter requested an accounting from Austin. At this point, Austin's failure to provide an accurate accounting of Plaintiffs' property as they requested amounted to a willful neglect of his duties to Plaintiffs. Specifically, Austin failed to produce records showing the disposition of Plaintiffs' property. When Austin ultimately provided a handwritten accounting in January 2006, the accounting failed to disclose payments to Bono and Stone, and failed to disclose that Austin had sold additional items of jewelry. The accounting also falsely stated that Austin paid additional funds to Gasarch.

   *d.* *Disposition of Plaintiffs' jewelry and property*

  Austin's disposition of Plaintiffs' jewelry and gold coins also amounts to a willful neglect of duty. Even if Lilly Beter had given Austin the authority to sell this property, his disposition of the second and third batches of jewelry were without the consent of Plaintiffs. The record shows that J.M. Beter, Lilly Beter, and Skolnick (Austin's co-counsel) repeatedly requested that Austin return the jewelry and provide an accounting. Skolnick testified that Plaintiffs needed the jewelry to settle a lawsuit filed by

-26-

J.B. Hudson – the jeweler from whom the jewelry was initially purchased. Although Austin returned some jewelry to Plaintiffs, he did not return the remaining jewelry, nor did he provide Plaintiffs with any accounting of the cash received from selling the jewelry. Austin cannot rely on a prior oral agreement with Lilly Beter to avoid his obligation to account for client property once the return of this property was requested by Plaintiffs. Nor can he rely on an agreement with Lilly Beter to avoid his obligations to J.M. Beter and the Trust.

      *e.*   *Use of Plaintiffs' money to pay gambling debts*

The court further concludes that Austin's use of Plaintiffs' money to pay lines of credit owed to casinos amounts to a willful neglect of duty. Austin contends that the funds he used for gambling represented the legal fees that he had earned to date. He contends Lilly Beter approved the disbursement of his fees from Plaintiffs' funds on hand.[6] In that regard, Austin points to the

---

    [6] During trial, Plaintiffs proffered two large binders of Austin's gambling records for the years 2005 and 2006 marked as proposed exhibits P-48 and P-49. Austin objected to the admission of these exhibits on the grounds of relevancy and because the probative value of the exhibits "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. Plaintiffs argued that this evidence is relevant to show that Austin gambled extensively during the period he represented Plaintiffs, and that Austin used some of Plaintiffs' funds for gambling. The court then took Austin's objection under advisement. After reviewing the record, the court sustains Austin's objections to these exhibits. The

-27-

January 2006 accounting, which shows disbursements to Austin's firm of almost $200,000 for legal fees. Beter denies that she agreed to this use of Plaintiffs' funds. Nothing in the record supports any such agreement between Austin and Beter allowing Austin to take his legal fees from the funds that he held in trust for Plaintiffs' benefit. Furthermore, the December 2004 Engagement Letter expressly governs Austin's fees, and that agreement expressly provides that Austin would provide detailed bills to Plaintiffs. Austin admits that he did not prepare or send a bill to Plaintiffs until he was required to do so in 2006.

> f. *Payments to Stone and Bono*

The settlement payments to Stone and Bono also amount to a willful neglect of Austin's duties. In both cases, the recipients of the funds were personal friends and business partners of Austin. The payments to Stone were for the benefit of Cornerstone, and Austin was an officer and shareholder of Cornerstone. Austin takes the position that Stone's company (Cornerstone) and Bono's company

---

record includes testimony – including admissions by Austin – that he used some of the funds he received from Plaintiffs to pay down lines of credit at casinos and for "walking around" money. (Tr. Vol. 2, p. 58-60.) Austin testified that these funds represented the portion of Plaintiffs' funds that he earned as a fee. In contrast, the voluminous gambling records in proposed exhibits P-48 and P-49 are not tied to any specific alleged uses of Plaintiffs' funds or property. The court concludes that these exhibits are cumulative and that their probative value is substantially outweighed by the danger of unfair prejudice. The court denies Plaintiffs' request to admit these exhibits.

-28-

(Total Telephone) were LBCG clients who were defrauded by William Rubin, and that the payments to them were authorized by Lilly Beter to settle those claims. According to Austin, the payment to Bono also included expense reimbursements for trips that Bono took with Austin to Minnesota to assist with Beter's case. Lilly Beter denies that she authorized these payments. There is nothing in the record to support Austin's contention that these disbursements were approved and appropriate. The fact that Austin did not disclose these payments in the January 2006 accounting further weakens his position that the payments were authorized. Moreover, Austin did not require either Bono or Stone to execute a release of their claims. Austin's actions in failing to document these transactions (including obtaining approval for the payments from each of his clients as well as obtaining releases) violates the trust duties imposed on him by the Rules of Professional Conduct.

g. *Austin's legal fees*

Austin also wilfully violated his duties by retaining Plaintiffs' funds for legal fees without authorization. The December 2004 Engagement Letter contains specific provisions governing billing and legal fees. The agreement provides for a $15,000 retainer and an hourly rate of $250 to be billed against the retainer. The agreement provides that Beter was to be billed monthly, and that the billings would show "where you stand as far

-29-

as your initial fee payment is concerned." Austin contends that he and Lilly Beter agreed that all of Plaintiffs' funds would be advanced to him as a large "potential" legal fee to avoid seizure by creditors, and that Austin would be entitled to some portion of those funds as a legal fee. This contention, however, is contradicted by the clear language of the December 2004 Engagement Agreement and Austin's verified answer in the Minnesota state court litigation. (Tr. Exh. 28.) In his answer, Austin stated that he was entitled to a minimum $300,000 fee from Beter for any criminal representation and an hourly fee for civil matters. There is no dispute that criminal proceedings were never commenced against Lilly Beter. Contrary to the terms of the Engagement Letter, Austin never sent monthly bills, nor did he provide regular accounts to Plaintiffs of where they stood as far as their initial retainer. Instead, in May 2006, Austin "reconstructed" his time records from December 2004 to May 2006 using Skolnick's time records, and created an invoice to support his claim of over $300,000 in legal fees. Austin testified that this invoice was "really a guesstimate." (Trans. Vol. 3, p.108.) In short, Austin retained Plaintiffs' funds for legal fees that were not billed or authorized in accordance with the December 2004 Engagement Agreement, and refused to return those funds when requested by Plaintiffs. Austin's retention and use of funds that he held in

-30-

trust for Plaintiffs is a willful violation of his duties under the Rules of Professional Conduct and amount to defalcation under section 523(a)(4).

### 4. Do Austin's Actions Amount to Fraud by a Fiduciary?

"Fraud" for purposes of section 523(a)(4) requires a showing of intentional deceit. <u>See</u>, <u>e.g.</u>, <u>In re McDaniel</u>, 181 B.R. 883, 887 (Bankr. S.D. Tex. 1994); <u>In re Wells</u>, 368 B.R. 506, 514 (Bankr. M.D. La. 2006). For a debt to be non-dischargeable under this section, the creditor must show – in addition to the existence of a fiduciary relationship – that (1) the debtor made a representation; (2) the debtor knew the representation was false; (3) the representation was made with the intent to deceive the creditor; (4) the creditor actually and justifiably relied on the representation; and (5) the creditor sustained a loss as a proximate result of its reliance. <u>In re Acosta</u>, 406 F.3d 367, 371 (5th Cir. 2005).

Plaintiffs contend that Austin committed fraud in the following respects:

> (1) Austin failed to place Plaintiffs' funds in his law firm trust account and/or withdrew those funds from his trust account for his personal use;
>
> (2) Austin failed to provide receipts for property received from Plaintiffs when requested;
>
> (3) Austin misled Skolnick about funds paid to settle the Gasarch matter and about the disposition of Plaintiffs' gold Krugerrand coins;

-31-

(4) Austin admitted that he misled to J.M. Beter with respect to the disposition of the Trust's funds;

(5) Austin provided Plaintiffs a handwritten accounting in January 2006 that falsely portrayed the status of their funds and property; and

(6) Austin provided false and misleading information in his court filings in connection with the Minnesota state court proceeding.

These fraud allegations must be weighed in the context of the parties' relationship. If the parties' entire relationship was defined solely by the December 2004 Engagement Letter, Austin's actions with respect to the use of funds transferred into his trust fund might present a very different case with respect to whether or not the record supports a claim of fiduciary fraud. As explained in the context of Plaintiffs' defalcation claim, however, the record shows that the parties' relationship was much broader – and, in some ways inconsistent – with the terms of the Engagement Letter. Plaintiffs wired a total of approximately $1.6 million to Austin by June 2005. The purpose of these wires was not for the money to sit in a law firm trust account, but for Austin to use that money to settle claims and pacify former LBCG clients, pay bills on behalf of the Beters, and return money to the Beter's for living expenses. Although Plaintiffs challenge some the payments made by Austin, they concede that payments of approximately $1,118,471.70 to Skolnick, Andrew Farmer, Gasarch, and others were legitimate

-32-

expenditures. Lilly Beter and J.M. Beter also turned over jewelry to Austin that they allege was worth over $1 million so that Austin sell the jewelry. All of these actions were outside the scope of the December 2004 Engagement Letter. The very fact that this broader relationship was not documented reflects some agreement on the part of the parties to avoid a "paper trail."

Given the nature of this relationship, the court concludes that Austin's actions with respect to the treatment of funds in his trust account and his failure to maintain records - while willful breaches of his duties - do not rise to fraud. Nor do the statements made to Skolnick with respect to the disposition of Plaintiffs' property. However, the allegations and evidence with respect to the January 2006 accounting present a different case. By the time Austin prepared this accounting, the record reflects that both Lilly Beter and J.M. Beter were demanding an accurate accounting of their property. By Austin's own admission, the handwritten accounting was false: (1) the accounting failed to disclose Austin's sale of the jewelry transferred to him; (2) the accounting falsely stated that Austin had paid an additional $150,000 to settle the Gasarch case when Austin admitted that the payment had not been made, and (3) the accounting did not disclose the payments Austin made to Bono and Stone. Courts have consistently found that a debtor's silence regarding a material

-33-

fact equates to a material representation sufficient to support a denial of discharge. <u>See</u>, <u>e.g.</u>, <u>Caspers v. Van Horne (In re Van Horne)</u>, 823 F.2d 1285, 1288 (8th Cir. 1987); <u>AT & T Universal Card Servs. v. Mercer ( In re Mercer)</u>, 246 F.3d 391, 403 (5th Cir. 2001); <u>Gen. Elec. Capital Corp. v. Acosta (In re Acosta)</u>, 2003 U.S. Dist. LEXIS 23450, *52-53 (E.D. La. Dec. 30, 2003). In short, Austin made a false statement, he knew it was false when he made it, and the statement was made to conceal payments that were made in violation of his duties. The flaw in this fraud claim, however, is that Plaintiffs must establish that they relied on the accounting and that they were injured as a result of that reliance. Plaintiffs' injury in this case is essentially the unauthorized payments – the willful breaches of duty that support a finding of defalcation under section 523(a)(4)– that occurred prior to the creation of the January 2006 accounting. In short, the record does not support the required nexus between Plaintiffs' reliance and their injury. As explained above, the elements of a claim for non-dischargeability are strictly construed in favor of the debtor and against the creditor. Accordingly, the court concludes that Plaintiffs have not established all of the elements of fiduciary fraud. The false accounting provided to Plaintiffs, however, further buttresses the court's conclusion that Austin committed acts of defalcation within the meaning of section 523(a)(4).

-34-

**5. Do Austin's Actions Amount to Embezzlement Under Section 523(a)(4)?**

Embezzlement under section 523(a)(4) is the "fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." Matter of Miller, 156 F.3d 598, 602 (5th Cir. 1998). Plaintiffs contend that Austin embezzled their property by removing their money from his trust account and using that money for his own purposes, including paying down lines of credit at casinos. Plaintiffs also contend that Austin committed embezzlement by selling their jewelry and Krugerrands without authority, and by failing to account for the proceeds of those sales. Austin contends that the withdrawals from his law firm trust account are consistent with his agreement with Lilly Beter that Austin would pay creditors and return funds to the Beters for living expenses. Austin also contends that any funds that he used for personal purposes were taken from the legal fees that he earned and paid out of Plaintiffs' funds. In that regard, Austin points to the January 2006 accounting provided to Plaintiffs, which discloses that $192,740 of fees and $58,721 of expenses had been disbursed to Austin's law firm as of January 2006. (Pl. Exh. 21.)

Plaintiffs' embezzlement claim is founded on essentially the same conduct and transactions as their defalcation claim. As the

-35-

court previously held, Plaintiffs have established by a preponderance of the evidence that Austin willfully breached his duties, and that Plaintiffs are entitled to a judgment in their favor under section 523(a)(4). However, the court concludes that this evidence does not support an embezzlement claim based on a fraudulent appropriation of property. The flaw in Plaintiffs' embezzlement claim is that the scope of Austin's relationship with Plaintiffs and his authority with respect to Plaintiffs' property is almost entirely undocumented. If the December 2004 Engagement Letter were the sole agreement between the parties, the record would likely support Plaintiffs' claim that Austin fraudulently appropriated property based on his use of Plaintiffs' funds for gambling and other personal uses. However, as the court has previously noted, the parties' course of conduct clearly shows a much broader, undocumented agreement between Austin and Plaintiffs with respect to Austin holding and selling Plaintiffs' property, and using Plaintiffs' funds to pay Plaintiffs' living expenses and creditors. Given this course of conduct and the disclosure of attorneys fees in the January 2006 accounting, Austin's conduct, while sufficient to establish a claim for defalcation, does not satisfy the elements required for a determination of non-dischargeability based on embezzlement.

-36-

**B.** **Non-Dischargeability Under 11 U.S. §523(a)(6) --**
**Willful and Malicious Injury**

Section 523(a)(6) provides for denial of the discharge of debts arising through "willful and malicious injury by the debtor to another entity or to the property of another entity." In order for conduct to qualify as willful and malicious the debtor must act with "either an objective substantial certainty of harm or a subjective motive to cause harm." Williams v. IBEW Local 520 (In re Williams), 337 F.3d 504, 509 (5th Cir. 2003) (quoting Miller, 156 F.3d at 606). Injuries that are negligently or recklessly inflicted are insufficient to meet the requirements of section 523(a)(6). Kawaauhau v. Geiger, 523 U.S. 57, 64, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). Injuries covered by section 523(a)(6) are not limited to physical damage or destruction; harm to personal or property rights is also covered by section 523(a)(6). 4 Collier on Bankruptcy ¶ 523.12(4) (15th ed. rev.2003). Willful conversion of another's property falls within section 523(a)(6). See Chrysler Credit Corp. v. Perry Chrysler Plymouth, Inc., 783 F.2d 480, 486 (5th Cir.1986); 4 Collier on Bankruptcy ¶ 523.12(4) (15th ed. rev.2004). The record does not support a claim of non-dischargeability under section 523(a)(6). A claim under this provision requires a showing that the debtor intended the harm inflicted on the creditor. Based on the record and the

-37-

relationship between the parties, the court does not find that Austin intended the damage inflicted upon Plaintiffs.

C. **Non-Dischargeability Under 11 U.S.C. §523(a)(2)(A)-- Fraud.**

Section 523(a)(2)(A) provides that "money, property, services, or an extension, renewal, or refinancing of credit" that is obtained through "false pretenses, a false representation, or actual fraud" is subject to exception from a debtor's discharge. 11 U.S.C. § 523(a)(2)(A). In order for a debt to fall within section 523(a)(2)(A), the debtor's fraud or false representation must involve the debtor's "moral turpitude or intentional wrong." Vizzini v. Vizzini ( In re Vizzini), 348 B.R. 339, 343 (Bankr. E.D. La. 2005), aff'd, 234 Fed. Appx. 234 (5th Cir. 2007) (quoting In re Chavez, 140 B.R. 413, 419 (Bankr. W.D. Tex. 1992)). Fraudulent acts which are implied in law and may exist in the absence of bad faith are insufficient to deny discharge. Id.

The record does not support a non-dischargeability claim under section 523(a)(2)(A). In order to state a claim, Plaintiffs must establish that Austin obtained their property through false statements or omissions. In other words, there must be a causal nexus between the fraud and the parting of property. While the court finds that Austin's January 2006 accounting supports a fraud claim, that accounting was produced long after Plaintiffs parted

-38-

with their property. Given this lack of a causal nexus between the false statements and the transfers of property, the court denies Plaintiffs relief under section 523(a)(2)(A).

**D. Defenses to Non-Dischargeability -- Unclean Hands and in Pari Delicto**

Austin raises the *in pari delicto* and "unclean hands" doctrines as a defense to Plaintiffs' non-dischargeability claims. The doctrine refers to "the plaintiff's participation in the same wrongdoing as the defendant." <u>Terlecky v. Hurd ( In re Dublin Sec. Inc.)</u>, 133 F.3d 377, 380 (6th Cir. 1997) (citing <u>Bubis v. Blanton</u>, 885 F.2d 317, 321 (6th Cir. 1989)). The phrase is short for " in pari delicto potior est condition defendentis," which means "where the wrong of both parties is equal, the position of the defendant is stronger." <u>Limor v. Buerger (In re Del-Met Corp .)</u>, 322 B.R. 781, 818 (Bankr. M.D. Tenn. 2005). "In essence, it prevents one wrongdoer from recovering from another because each should bear the consequences of their wrongdoing without legal recourse against the other." <u>Liquidating Tr. of the Amcast Unsecured Creditor Liquidating Trust v. Baker (In re Amcast Indust. Corp.)</u>, 365 B.R. 91, 123 (Bankr. S.D. Ohio 2007). The doctrine is based on the premise that courts should not mediate between wrongdoers where the wrongdoing of the plaintiff contributed to his or her injury. <u>Bateman Eichler, Hill Richards, Inc. v. Berner</u>, 472 U.S. 299, 307,

-39-

105 S.Ct. 2622, (1985) (*in pari delicto* is "limited to situations where the plaintiff truly bore at least substantially equal responsibility for his injury"); <u>Lawler v. Gilliam</u>, 569 F.2d 1283, 1292 (4th Cir. 1978) (The doctrine "deals generally with parties whose equal, mutual, and simultaneous fault casts them in the role of conspirators."). The related equitable doctrine of "unclean hands" allows a court to bar equitable relief when a party asserting an equitable claim against another can be shown to have engaged in fraud or bad faith behavior with that person. <u>Alcatel U.S.A., Inc. v. DGI Technologies, Inc.</u>, 166 F.3d 772, 796 (5th Cir.1999).

The record does not support Austin's affirmative defenses of *in pari delicto* and "unclean hands." The basis for these defenses is that Lilly Beter agreed to a scheme in which Plaintiffs' property was hidden from creditors, and that she instructed Austin to conceal this scheme from J.M. Beter and Skolnick. While the record supports Austin's contention that the parties entered into a plan that involved, *inter alia*, placing assets beyond the reach of creditors, these facts do not defeat Plaintiffs' non-dischargeability claims. The gravamen of both defenses is the "equal, mutual, and simultaneous fault" of the plaintiff and the defendant. <u>Lawler</u>, 569 F.2d at 1292. Here, the relative misconduct of the parties is not "equal, mutual, and simultaneous."

-40-

As a lawyer and fiduciary bound by the Louisiana Rules of Professional Conduct, Austin's duties (and, hence, his breach of those duties) are not equivalent to duties of his client. Furthermore, even if Lilly Beter's conduct would support these defenses, Ausin admits that J.M. Beter - individually and as trustee of the Trust - was kept in the dark about his agreement with Lilly Beter. Accordingly, these defenses could not apply to J.M. Beter or the Trust, even though the vast majority of the funds transferred to Austin were the property of the Trust. In sum, neither defense shields Austin from his breaches of duty and the false accounting that he provided to Plaintiffs.

## E. Plaintiffs' Damages

### 1. Funds Transferred to Austin.

Austin received a total of $1,877,802.50 of funds from Plaintiffs in wire transfers and cash. Of this amount, Plaintiffs do not dispute expenditures of $1,118,471.70. Austin The remainder - $759,330.80 - includes the payments to Stone ($175,000) and Bono ($216,147.86), as well as legal fees and expenses claimed by Austin. As explained herein, Austin's actions in paying these amounts and withholding funds for his fee amounts to defalcation under section 523(a)(4). The court concludes that the record does not support Austin's contention that he returned an additional $400,000 in cash payments to Plaintiffs. Plaintiffs are therefore

-41-

entitled to judgment for **$759,330.80**, and this amount shall not be subject to discharge pursuant to section 523(a)(4).

### 2.   Jewelry and Krugerrands

Plaintiffs contend that the total value of the jewelry and Krugerrands transferred to Austin totaled $1,590,370, excluding the items returned to Skolnick and the $130,000 diamond ring in the possession of the Trustee. Austin contends that he sold the jewelry that was not returned for a total of $340,000 ($70,000 for the first batch, $120,000 for the second batch, and $150,000 for the third batch), and that he sold the Krugerrands for $121,000. Based on the court's findings under section 523(a)(4), Austin breached his duties by failing to properly account for the disposition of this property. Plaintiffs are entitled to damages equal to value of the value of the property. Plaintiffs concede that the $1,590,370 figure is based on the list retail price of the items purchased from J.B. Hudson. These values do not reflect the current market value of those items. Indeed, the J.B. Hudson records admitted during trial indicate that the retail list prices of these items may have been subject to discounts up to 25%. (Pl. Exh. 15.) The parties have presented no additional evidence of value except for Austin's testimony on the amount that he received for selling the jewelry. Accordingly, based on the list retail value and the evidence in the record, the court fixes the value of

-42-

the Krugerrands at $121,000, and the value of the remaining jewelry at $734,685 (50% of the retail value of the jewelry excluding the Krugerrands). Accordingly, Plaintiffs are entitled to a judgment of **$855,685** with respect to the jewelry and Krugerrands.[7]

### 3. Damages Resulting From the Gasarch Settlement

Plaintiffs contend that Austin failed to pay $150,000 of Plaintiffs' funds toward the settlement of the claims of Jason Gasarch and, as a result, Gasarch commenced litigation against Lilly Beter seeking $1,400,000. Plaintiffs seek damages of the entire amount sought by Gasarch. After reviewing the record and the memorandum of understanding between Beter and Gasarch, the court denies the request for damages of $1,400,000. The Gasarch claim has never been liquidated, and it is unclear from the record whether Gasarch will ultimately prevail on the full amount of his claim. Moreover, based on the terms of the MOU, Austin's payment of the $150,000 was not the sole condition to the settlement. The agreement required the transfer of 2 million shares of Peninsula

---

[7]     Austin questions whether Plaintiffs have proven that they owned the jewelry. Specifically, Austin points to evidence in the record that some of the jewelry was purchased on the account of LBCG or Bill Rubin. The record supports Plaintiffs' contention that they owned the jewelry. It is undisputed that Plaintiffs had possession of the jewelry before transferring the jewelry to Austin. The record also supports Plaintiffs' contention that the funds used to purchase the jewelry on the account of LBCG and Rubin ultimately came from Lilly Beter.

common stock by Beter. The record does not reflect that this was done. Accordingly, Plaintiffs have not established that Austin's actions were the cause in fact of the Gasarch litigation. As previously stated, actions to declare debts non-dischargeable are strictly construed in favor of the debtor. The court concludes that Plaintiffs are not entitled to a finding of non-dischargeability as to the $1,400,000 in damages sought by Justin Gasarch.

## F.   The Trustee's Motion to Sell.

The Trustee also filed a motion seeking leave to sell a "gentlemen's fashion diamond ring" that was in Austin's possession. This motion was consolidated with the present adversary proceeding. None of the parties dispute that the ring was part of the jewelry transferred from the Beters to Austin, and Plaintiffs value the ring at $130,000. Austin contends that he "purchased" the ring for $40,000, and that he had Lilly Beter's permission to do so. Lilly Beter denies that she agreed to sell the ring to Austin. There is no evidence in the record supporting Austin's testimony that Beter agreed to sell the ring to Austin, or that Austin paid Plaintiffs $40,000 for the ring. Beter transferred the ring to Austin in trust so that the ring could be sold. Plaintiffs later requested the return of the jewelry. The record supports Plaintiffs' position that they retained their ownership interest in the ring. As explained above, as a lawyer and fiduciary, Louisiana law

-44-

imposed trust-like duties on Austin, and he breached those duties in his disposition of the ring and the other property entrusted to him by Plaintiffs. Accordingly, the Trustee's motion is denied. The Trustee shall return the ring to Lilly Beter with 30 days. Lilly Beter will bear any cost incurred by the Trustee in returning the ring.

## G. **Plaintiffs' Request to Lift the Court's Order Sealing the Record.**

In their post-trial brief, Plaintiffs request that the court lift the order sealing the record in this case. Austin opposes any modification of the court's order. The parties originally agreed to seal the record, and had entered into a confidentiality agreement. The court is not inclined to grant this relief absent a motion and full briefing of the issues raised by the Plaintiffs' request. The court, therefore, denies Plaintiffs' request to modify the court's order with respect to sealing the record without prejudice to this request being raised in a proper motion.

### CONCLUSION

For the foregoing reasons, the court finds for Plaintiffs on their claims under 11 U.S.C. §§ 523(a)(4). Plaintiffs are entitled to judgment in the amount of **$1,615,015.80**. Plaintiffs shall submit a judgment in conformity with these Reasons for Decision within 30 days.

###